**Opinion issued November 20, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-12-01125-CR**

————————————

**GARY WAYNE WILSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1068173**

---

## DISSENTING OPINION

Gary Wayne Wilson was convicted of aggravated sexual assault of a child, and the jury assessed his punishment at life imprisonment.[1] Wilson's position before this Court is that the trial court erred by excluding the testimony of his

---

[1]     *See* TEX. PENAL CODE ANN. §§ 21.02(b), (h), 22.021(a)(1)(B) (West Supp. 2014).

friends and family regarding his character for moral and safe conduct around young children and that the error deprived him of his only meaningful defense. I concur that the trial court's exclusion was error and that Wilson preserved this argument for our review, however, I do not believe the error is constitutional error such that Wilson was deprived of a fair trial, and respectfully dissent.

## Non-Constitutional Error

It is well-established that the erroneous admission or exclusion of evidence is generally considered non-constitutional error. *Melgar v. State*, 236 S.W.3d 302, 308 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). The erroneous exclusion of evidence, however, can rise to the level of constitutional error under very limited circumstances, including when the excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). Cases involving such constitutional errors are rare exceptions to the rule. *See id.* at 663 ("Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense.")

The excluded evidence in this case consists of opinion testimony from seven of Wilson's family members and a close friend (Wilson's two daughters, a son, a niece, a nephew, his brother, and his brother's girlfriend) who would have testified that they had a "good" opinion concerning Wilson's character in regard to his

moral and safe conduct around children. The majority states that:

> A review of the record indicates, then, that [Wilson]'s sole available defense was the testimony of his friends and family that such actions are not in keeping with his character. That testimony did not only go to the heart of his defense. *See Wiley*, 74 S.W.3d at 405. It was the sum total of his defense. Additionally, [Wilson]'s credibility and character are pivotal matters in this case. *See Hammer*, 296 S.W.3d at 561. Accordingly, we hold that the exclusion of the evidence was constitutional error.[2]

I strongly disagree that Wilson's *sole* available defense at trial was that the acts alleged were "not in keeping with his character." Wilson's defense, as illustrated by the record, was that K.M. was a manipulative child with severe psychiatric issues who was fabricating these allegations of abuse. When the complainant testifies that the defendant sexually assaulted him, as in this case, the defensive theory that "sexually assaulting young boys is not in keeping with my character" is a natural corollary to the theory that "the duplicitous and mentally

---

[2] I also note that the majority's application of constitutional harm analysis in this case effectively creates an impossible test under which no constitutional error could ever be considered harmless when issues of witness credibility and reliability are involved. The majority reasons that as an appellate court with nothing but a cold record, it cannot "assess how the jury would have assessed the credibility of the seven witnesses offered by the defense to testify on [Wilson]'s good character regarding moral and safe conduct around children," and therefore, it cannot "determine[] beyond a reasonable doubt that the error did not contribute to [Wilson's] conviction or punishment." Despite the acknowledgement that a cold record is ill suited for determinations of credibility, the majority opinion nevertheless discounts the testimony of K.M.'s sister and the State's other witnesses and even goes so far as to suggest that K.M.'s sister "could have motivations to testify other than to give an unaltered account of what she observed, a matter that could be informed by determinations of credibility."

disturbed boy is fabricating these claims of abuse"—the latter theory is the one Wilson advanced at trial. One theory is intrinsically linked with the other.

The boy's lengthy history of behavioral, legal, and psychiatric problems were extensively explored during Wilson's cross-examination of his father and K.M.'s doctors.[3] Indeed, Wilson's jury argument highlighted the unreliability of K.M.'s testimony, and maintained, as such, that the State had failed to carry its evidentiary burden. Thus, it is evident from the record that the proffered testimony from Wilson's family and close-family friends regarding his character for moral and safe conduct around young children did not constitute the "sum total of his defense." It is further evident that this evidence would, at most, have only "incrementally" advanced Wilson's defensive theory of fabrication by indirectly attacking K.M.'s credibility. *See Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005) (holding erroneously excluding testimony that incrementally furthers defense is non-constitutional error). Moreover, the fact that Wilson was unable to present positive character testimony does not necessarily mean that the error was of a constitutional magnitude, especially in such a case as this with physical and corroborating evidence. *See, e.g., Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009) (stating that credibility of complainant and defendant "is a central, often dispositive, issue" in sexual assault trials because "[s]exual assault

---

[3] Wilson could have cross-examined K.M. and further developed this defensive theory, but did not.

4

cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, *unaided by any physical, scientific, or other corroborative evidence*.") (emphasis added).

As such, I would hold that the exclusion of the proffered testimony, while erroneous, is non-constitutional error and, therefore, subject to Rule 44.2(b) analysis.

**Harm Analysis: Non-Constitutional Error**

Non-constitutional error must be disregarded unless the error affects the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected when an error has a substantial and injurious effect or influence in determining a jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (stating that such error is harmless if, after reviewing entire record, reviewing court has "fair assurance that the error did not influence the jury, or had but a slight effect"). Accordingly, a criminal conviction should not be overturned based upon non-constitutional error absent "grave doubt" by the reviewing court that the result of the trial was free from the substantial effect or influence of that error. *See Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002). "Grave doubt"

means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

Our assessment of harm resulting from a non-constitutional error examines the entire record and we "calculate, as much as possible, the probable impact of the error upon the rest of the evidence." *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). To be considered, among other relevant factors, is the testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in case. *Barshaw v. State*, 342 S.W.3d 91, 94 (Tex. Crim. App. 2011).

Despite the majority's protestations to the contrary, the direct and circumstantial evidence supporting the jury's verdict in this case is extremely strong, if not overwhelmingly so. *See Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002) (stating overwhelming evidence of guilt is one factor for court to consider when assessing harm resulting from non-constitutional error). K.M. testified with specific and graphic detail about four different violent sexual assaults by Wilson, as well as various other instances of physical abuse. According to

K.M., Wilson became more violent with him as time went on and even began using duct tape to physically restrain the young boy while the abuse was occurring.[4]

Perhaps more importantly, K.M.'s testimony is corroborated by his sister, who testified that she observed Wilson physically and sexually abuse K.M. on several occasions. Like K.M., she was able to describe the sexual assault she witnessed with specific detail for the jury. In particular, K.M.'s sister testified that one day she was walking down the hallway of their house and noticed that K.M.'s bedroom door was slightly ajar. She looked in and saw K.M. lying face-down on the floor, naked, flailing his arms, with Wilson on his knees behind K.M., hunched over the boy's body. She heard her brother yelling for Wilson to get off him, and she saw Wilson pinning K.M. down by holding his arms down, while he moved his body back and forth on top of K.M. She testified that her initial failure to disclose this sexual assault was due to Wilson's threat to kill her and her father if she did. She also corroborated K.M.'s testimony about Wilson's other sexually inappropriate behavior while living with them and their mother that at an expert characterized as "grooming" (i.e., that Wilson walked around the house naked, had sex with their mother in front of them, and that Wilson kept pornographic magazines in the bathroom and on the living room coffee table).

---

[4]     K.M. described one occasion for the jury when Wilson tied K.M.'s hands together with duct tape and bound the first or second grader to the frame of his bed so that he could not escape Wilson's violent sexual assault.

Both K.M. and his sister's testimony was further corroborated by Dr. Donaruma, a child abuse pediatrician, who discovered an anal tear in the course of her 2006 examination of K.M. consistent with sexual abuse. Donaruma explained that such injuries are not only uncommon but consistent with repeated anal sexual assault over a number of years. On cross-examination, Dr. Donaruma testified that although there could be multiple explanations for the oval tear that she described, given the "absence of a history of constipation, encopresis, or painful defecation," K.M.'s injury was "*highly suspicious for the occurrence of penetrating anal trauma.*" (emphasis added).

K.M.'s father and his elementary school counselor[5] also testified that K.M. began to act out at school and demonstrate significant behavioral problems beginning in kindergarten/first grade—when Wilson began living with the family. This evidence corroborates K.M.'s testimony that he started acting out at school when he was in kindergarten and first grade as a result of the sexual and physical abuse he was experiencing at home by Wilson. Specifically, K.M.'s guidance counselor testified that towards the end kindergarten and beginning of his first grade year, K.M., who had previously never exhibited behavioral problems in the classroom, began to get very angry, very easily and was prone to emotional, violent outbursts (e.g., kicking and screaming or pushing chairs). These behavioral

---

[5] The majority omits mentions of testimony from K.M.'s elementary school counselor, which corroborates K.M.'s and his father's testimony.

8

problems escalated to the point where he would run out of the classroom and onto the playground and, if already on the playground, runaway from school altogether. In October 2005, after she saw bruises on K.M.'s back and legs and scratches on his neck and ear lobes, the counselor contacted CPS. K.M., in second grade at the time, testified that he had confided Wilson's physical abuse to the counselor.[6]

The psychiatric testimony as to the improvement of K.M.'s attitude and behavior once he moved out of the home he shared with his mother and Wilson also supports this claim; as do K.M.'s PTSD diagnosis, history of suicidal ideations at the tender age of seven or eight,[7] the testimony of his father and two other treating therapists/psychologists[8] about his behavioral and interpersonal problems, and the testimony of Dr. Thompson that PTSD can be a sign of sexual abuse and that sexually abused children exhibit characteristics such as depression, suicidality, and interpersonal difficulties and often have problems dealing with authority figures. The evidence corroborating K.M.'s and his sister's testimony regarding the sexual abuse is abundant.

---

[6]    Six months later, in March 2006, K.M. told his therapist that Wilson had sexually assaulted him.

[7]    K.M.'s psychiatrist testified that K.M. was hospitalized, in part, because the seven or eight-year-old boy had reported having suicidal ideations (i.e., wanting to kill himself) and hearing voices telling him to hurt his mother.

[8]    In particular, therapist Sherry Taylor who began treating K.M. in January 2006 and clinical psychologist Lisa Matthews who treated K.M. in 2012.

Absolutely crucial to note is that Wilson's character is not critical to the disposition of the present case because this is no simple "he said, she said" case—here, there is evidence of an anal injury consistent with sexual abuse ("highly suspicious for the occurrence of penetrating anal trauma,") and other corroborating testimony from K.M.'s father, sister, elementary school counselor, therapists, and doctors. *Cf. Hammer*, 296 S.W.3d at 561–62 (stating that credibility of complainant is important in sexual assault trials because "[s]exual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, *unaided by any physical, scientific, or other corroborative evidence*.") (emphasis added). Sexual assault cases rarely have such compelling corroborating evidence.

After reviewing the entire record in this case, including the ample evidence supporting the jury's verdict, I have "fair assurance" that the exclusion of Wilson's good character evidence "did not influence the jury, or had but a slight effect." After applying the proper non-constitutional harm analysis, I would hold that the erroneous exclusion of the testimony from seven of Wilson's close family and friends was non-constitutional error and does not require reversal. Accordingly, I

would affirm the trial court's judgment.


Jim Sharp
Justice


Panel consists of Justices Jennings, Higley, and Sharp.

Justice Sharp, dissenting.

Publish. TEX. R. APP. P. 47.2(b).